

# EMPLOYMENT AGREEMENT
# MTX GROUP INC

## Employment Agreement



This Employee Agreement (the "**Agreement**"), effective as of the date of this agreement (the "**Effective Date**"), by and between MTX Group Inc, located at 1450 Western Avenue, Suite 304, City of Albany, State of New York ("**Company**"), and the employee named below ("**Employee**").

Whereas,

The Company is engaged in the business of providing Information Technology Services ("Business");

The Company wishes to engage the service of the Employee and the Employee agrees to provide his service to the Company in the manner as set forth in this Agreement; and

The Company's engagement and continual employment of the Employee is conditioned upon the Employee's express acceptance of and adherence to the terms set forth in this Agreement and any deviations therefrom shall be a valid ground for his termination.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants, agreements and obligations set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties to this Agreement, the Employee and the Company hereby agree to the foregoing and as follows:

### 1. Term and Termination.

1.1 This Agreement takes effect immediately as of the Effective Date and remains in full force and effect unless terminated under Section 1.3, Section 1.4 or for cause described within this Agreement and within the Non-Disclosure and Non-Compete Agreements.

1.2 The exact length of the Term is undetermined at this time and shall continue beyond the initial scope of Services performed as seen fit by the Company unless terminated in accordance with section 1.3 of this Agreement.

1.3 Either Party may terminate this Agreement for cause by providing the other Party written notice if the other Party: (i) is in material breach of this Agreement or any provision therein of this Employment Agreement, the Non-disclosure and the Non-compete Agreement and has failed to cure such breach within five (5) days after its receipt of written notice of such breach provided by the non-breaching Party; (ii) engages in any unlawful business practice related to that Party's performance under the Agreement; or (iii) files a petition for bankruptcy, becomes insolvent, acknowledges its insolvency in any manner, ceases to do business, makes an assignment for the benefit of its creditors, or has a receiver, try or similar party appointed for its property.

1.4 Employee will be an at will employee of the Company, which means the employment relationship can be terminated by either of Party for any reason, at any time, with or without prior notice and with or without cause. Any statements or representations to the contrary (and, indeed, any statements contradicting any provision in this Agreement) should be regarded by you as ineffective.

1.5 The official start date of employment is February 4, 2019.

### 2. Employment.

2.1. The Company hereby employs the Employee, and the Employee hereby accepts employment with the Company, in the role in title described below in Schedule A of this Agreement, pursuant to and in accordance with the terms and conditions set forth in this Agreement. During the Term, the Employee agrees to perform such duties and responsibilities under this Agreement, which duties and responsibilities are commensurate with the Employee's position with the Company, or other such services as mutually agreed upon in writing by the Parties (email is acceptable) ("Services"). The Employee shall devote his full time, attention, energy and efforts, to fully and prudently perform such duties and responsibilities in good faith.

2.2 The Employee shall receive such holidays and sick leaves as he is entitled to in accordance with the Company's policies in effect from time to time. Employee shall be provided with the Company's written Travel Benefits policy. Currently, the Employee will be entitled to a total of 15 Days of Paid Time Off (PTO) per year, in accordance with the Company's leave policy detailed in the Employee Handbook.

**Employment Agreement** 

2.3 The Employee shall notify the Company of any change(s) to the Employee's schedule that could adversely affect the availability of the Employee, whether known or unknown at the time of this Agreement, no later than 10 days prior to such change(s). If the Employee becomes aware of such change(s) within the 10 day period, the Employee shall promptly notify the Company of such change(s) within a reasonable amount of time.

2.4 The work performed by the Employee shall be performed at the following rate:

Salary: **$70,000** per year.

2.5 The Employee will be entitled to participate in the Company's employee benefit plans and programs in effect from time to time, as and when appropriate, including, without limitation, employee stock option plans, medical reimbursement plans and group life, health, long-term and short-term disability and other insurance programs, if any, as applicable to the Employee as per the policies of the Company.

2.6 Employee understands that the first 90-days of Employment shall constitute a Probationary Period. During the Probationary Period, Employee is not eligible for paid time off. The Company may choose not to enforce this provision from time to time, and it shall never constitute a waiver of this this section or any provision of this Agreement.

2.7 During the Term of employment, the Employee will serve honestly, faithfully, diligently and efficiently for the growth of the Company, and the Employee's conduct shall be in conformity with the code of conduct as provided in the Company's policies in force from time to time. Further, during the Term, the Employee will not engage in any other business activity, regardless of whether such activity is pursued for profit, gain, or other pecuniary advantage.

2.8 The Employee acknowledges and agrees that he/she is not authorized to sign any document and/or make any financial commitment for or on behalf of the Company, without obtaining the prior written permission of the Company in this regard. The Employee shall have no authority, implied or otherwise, to pledge the credit of the Company. In the event the Company is held liable for any damage, loss, claim or action arising directly or indirectly from any action of the Employee in violation of this clause, the Employee shall indemnify the Company in accordance with section 5 of this Agreement.

### 3. Ownership.

3.1 As a result of providing the Services, the Employee or Employee Personnel may create certain work product (the "Work Product").

3.2 The Parties intend that, to the extent the Work Product or a portion of the Work Product qualifies as a "work made for hire," within the definition of Section 101 of the Copyright Act of the United States (17 U.S.C. § 101), it will be so deemed a work made for hire. If the Work Product or any portion of the Work Product does not qualify as work made for hire, and/or as otherwise necessary to ensure the Company's complete ownership of all rights, titles and interest in the Work Product, the Employee shall transfer and assign to the Company all rights, titles and interests throughout the world in and to any and all Work Product. This transfer and assignment includes, but is not limited to, the right to publish, distribute, make derivative works of, edit, alter or otherwise use the Work Product in any way the Company sees fit.

3.3 The Company grants the Employee, a limited, non-exclusive, non-transferable, non-assignable, royalty free, worldwide license to display the Work Product on a platform personally controlled, in whole or in part, by the Employee. The Company may revoke this license at any time by requesting the removal of the Work Product displayed by the Employee. Upon such request, the Employee shall remove the Work Product from the platform, and provide written notification of such removal.

**4. Representations.** Both Parties represent that they are fully authorized and empowered to enter into this Agreement, and that the performance of the obligations under this Agreement will not violate or infringe upon the rights of any third-party, or violate any agreement between the Parties and any other person, firm or organization or any law or governmental regulation.

MTX Group Inc.

2

**Employment Agreement**



5. **Indemnification.** The Employee shall indemnify and hold harmless the Company, its affiliates, and its respective officers, directors, agents and employees from any and all claims, demands, losses, causes of action, damage, lawsuits, judgments, including attorneys' fees and costs, arising out of, or relating to, the Employee's services under this Agreement.

6. **Confidential Information.**

6.1 The Employee acknowledges and agrees that, during his association with and employment by the Company, the Employee will create, have contact with and receive confidential and proprietary information and/or trade secrets of the Company, including without limitation, Client lists, Prospect lists, Work Products, inventions, software programs, trade secrets, market or other research or any program, product or service which was developed by, for or on behalf of the Company or which the Company provides or intends to provide to its Clients or markets to its Clients or Prospects, and financial and accounting data, information relating to Company's or its Client's business, marketing and sales plans, strategies, operations, finances, plans or opportunities, including the identity of, or particulars about the Company's or its Client's employees, contractors, customers or suppliers information not limited to technology, tools, processes, methods, data, pricing methods, vendor and customer information and lists, employee lists, data handling methodology and processes, and research processes and strategies, business process and any other information marked or otherwise identified as confidential, restricted, secret, or proprietary, including information acquired by inspection or oral or visual disclosure or disclosure through electronic media, and any other information disclosed under circumstances in which a reasonable person would understand that such information is confidential and proprietary to the Company (collectively "Confidential Information"); and that any improper taking, disclosure or use of this Confidential Information would cause the Company substantial loss, damage and irreparable harm.

6.2 During the Term and for the Restricted Period (as defined in Section 5.3 below), the Employee will not, either directly or indirectly use, divulge, disclose, disseminate or otherwise communicate to any other person or entity, any of the Confidential Information in any manner whatsoever, except in the course of and during the performance of his duties and responsibilities to and for the Company pursuant to his employment arrangement with the Company (provided the Company otherwise consents, in writing, to the use or disclosure of any of the Confidential Information prior to such use or disclosure and then only with respect to those items of Confidential Information specifically described and only to the extent specifically authorized, in such written consent).

6.3 With respect to each particular item of Confidential Information, the "Restricted Period" shall mean: (i) sixty (60) months following the effective date of the termination of this Agreement for any reason whatsoever, if the item of Confidential Information at issue does not constitute a trade secret; or (ii) indefinitely, if such item of Confidential Information constitutes a trade secret, until such item of Confidential Information ceases to be a trade secret, but in no case less than the later of sixty (60) months following the effective date of the termination of this Agreement for any reason whatsoever.

6.4 Notwithstanding the foregoing, Confidential Information does not include any information that (i) at the time of the disclosure or thereafter is lawfully obtained by the Employee from publicly available sources generally known by the public (other than as a result of a disclosure by the Employee or by his representatives); (ii) is available to the Employee on a non-confidential basis from a source that is not and was not bound by a confidentiality agreement with respect to the Confidential Information; (iii) has been independently acquired or developed by the Employee without any use of the Confidential Information or the Company's resources; or (iv) the Employee is required to disclose pursuant to any governmental, judicial, or administrative order, subpoena, discovery request, regulatory request or similar method, provided that the Employee promptly notifies, to the extent practicable, the Company in writing of such demand for disclosure so that the Company may, at its sole expense, seek to make such disclosure subject to a protective order or other appropriate remedy to preserve the confidentiality of the Confidential Information.

6.5 Upon the effective date of the termination of this Agreement for any reason whatsoever, Employee will immediately return to the Company all original and all copies of Confidential Information, and

   a. all files, notes, analyses, memoranda, programs, codes or any other documents or writings containing, representing, evidencing, recording, constituting, incorporating or referring to any of the Confidential Information, however and whenever produced, whether developed before or after the date of this Agreement, and
   b. all disks, software, hard drives, computer memory or other electronic or magnetic storage containing, representing, evidencing, recording, constituting, incorporating or referring to any Confidential Information,

**Employment Agreement**



---

however and whenever produced, whether developed before or after the date of this Agreement, whether in his possession or under his control, and

c. will certify in writing to the Company that, except in the course of and during the performance of his duties and responsibilities to and for the Company pursuant to his employment arrangement with the Company, he has not retained, disseminated, disclosed or delivered to any person or entity any original or copy, in any form, electronically, magnetically or otherwise, of any of the Confidential Information or other information as mentioned in sub-clause (a) and (b) above.

### 7. Non-Competition.

7.1 The Employee shall not, during the Term, directly or indirectly, individually or in combination or association with any other person or entity, whether as an officer, director, employee, shareholder, member, partner, joint venturer, sole proprietor, agent, independent contractor, consultant, advisor or otherwise, whether or not for pecuniary benefit, engage in or own (in whole or in part), manage, loan money to, operate or otherwise carry on any business with the Clients, competitors or associates of the Company.

7.2 The Employee acknowledges and agrees that the restrictive covenants set forth in this Section 6 are necessary in order to protect and maintain the proprietary interests and other legitimate Business interests of the Company and are reasonable in all respects.

7.3 The Employee acknowledges and agrees that the geographical scope of the non-competition covenants set forth in this Section 7 will not be limited and this broad scope and lack of geographical limitation is vitally necessary to protect and maintain the Company and the proprietary interests and other legitimate Business interests of the Company. Consequently, the Employee acknowledges and agrees that the duration, scope and geographic areas of the covenant to not compete specified in this Section 7 are fair, reasonable and necessary in order to protect the goodwill and other legitimate interest of the Company, that adequate consideration has been received by Employee for such a covenant to not compete and that abiding by such a covenant to not compete does not and will not prevent the Employee from earning a livelihood.

### 8. Non-Solicitation.

8.1 Non-Solicitation of Clients and Prospects. During the Term and for a period of two (2) years following the effective date of the termination of this Agreement for any reason whatsoever, the Employee will not, directly or indirectly, individually or in combination or association with any other person or entity, whether as an officer, director, employee, shareholder, member, partner, joint venturer, sole proprietor, agent, independent contractor, consultant, advisor or otherwise, whether or not for pecuniary benefit, solicit, or assist or encourage any other person or entity to solicit, any Client or any Prospect, nor will the Employee:

1. engage any Client with products or services which may be used in substitution for or replacement of such products and/or services offered by the Company;

2. directly or indirectly participate in any attempt to cause any Client to terminate, alter or modify such Client's business relationship with the Company;

3. participate in any attempt to cause any Client to alter or modify any terms or reduce the volume of business which such Client transacts with the Company; or

4. negatively influence any Client's or Prospect's decision as to whether or not they should engage in a business relationship with the Company.

For purposes of this Agreement, the term "Client" will mean any person or entity who had been sold products or services of the Company at any time during the thirty six (36) months period immediately preceding the effective date of the termination of this Agreement, and the term "Prospect" will mean any person or entity who had been actively solicited by or on behalf of the Company during the twelve (12) months period immediately preceding the effective date of the termination of this Agreement.

8.2 Non-Solicitation of Employees, Independent Contractors and Agents. Except in the course of and during the performance of his duties to the Company, during the Term and for a period of two (2) years following the effective date of the termination of this Agreement for any reason whatsoever, the Employee will not, directly or indirectly,

## Employment Agreement



individually or in combination or association with any other person or entity, whether as an officer, director, employee, shareholder, board member, partner, joint venturer, sole proprietor, agent, independent contractor, consultant, advisor or otherwise, whether or not for pecuniary benefit:

1. contact, encourage or solicit any then existing employee, independent contractor or agent of the Company to terminate or modify his, her or its respective employment, engagement or business relationship with the Company;

2. hire or otherwise retain any such employee or agent of the Company; or

3. hire or otherwise retain any such independent contractor performing services for or on behalf of the Company.

**9. Liability.** EXCEPT WITH RESPECT TO THE PARTIES' INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT, INCLUDING BODILY INJURY, DEATH, LOSS OF REVENUE, OR PROFITS OR OTHER BENEFITS, AND CLAIMS BY ANY THIRD PARTY, EVEN IF THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION APPLIES TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION TO BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, AND OTHER TORTS.

**10. Disclaimer of Warranty.** THE WARRANTIES CONTAINED HEREIN AND IN THE NONDISCLOSURE AGREEMENT AND THE NON-COMPETE AGREEMENT ARE THE ONLY WARRANTIES MADE BY THE PARTIES HEREUNDER. EACH PARTY MAKES NO OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED, AND EXPRESSLY EXCLUDES AND DISCLAIMS ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. THE COMPANY DOES NOT PROVIDE ANY WARRANTY THAT OPERATION OF ANY SERVICES HEREUNDER WILL BE UNINTERRUPTED OR ERROR-FREE.

**11. Miscellaneous.**

11.1 This Agreement constitutes the entire understanding between the parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the parties, with respect to the subject matter hereof. This Agreement can only be modified by a written amendment signed by the party against whom enforcement of such modification is sought.

11.2 The validity, construction and performance of this Agreement shall be governed and construed in accordance with the laws of New York applicable to contracts made and to be wholly performed within such state, without giving effect to any conflict of laws provisions thereof. The Federal and state courts located in New York shall have sole and exclusive jurisdiction over any disputes arising under the terms of this Agreement.

11.3 Any failure by either party to enforce the other party's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

11.4 Although the restrictions contained in this Agreement are considered by the parties to be reasonable, if any such restriction is found by a court of competent jurisdiction to be unenforceable, such provision will be modified, rewritten or interpreted to include as much of its nature and scope as will render it enforceable. If it cannot be so modified, rewritten or interpreted to be enforceable in any respect, it will not be given effect, and the remainder of the Agreement will be enforced as if such provision was not included.

11.5 Any notices or communications required or permitted to be given hereunder may be delivered by hand, deposited with a nationally recognized overnight carrier, electronic-mail, or mailed by certified mail, return receipt requested, postage prepaid, in each case, to the address of the other party first indicated above (or such other addressee as may be furnished by a party in accordance with this paragraph). All such notices or communications shall be deemed to have been given and received (a) in the case of personal delivery or electronic-mail, on the date of such delivery, (b) in the case of delivery by a nationally recognized overnight carrier, on the third business day following dispatch and (c) in the case of mailing, on the seventh business day following such mailing.

**Employment Agreement**



11.6 This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. A signed copy of this Agreement or any other Transaction Document transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement or such other Transaction Document for all purposes. A digital or electronic signature shall have the same force and legal effect as a signature affixed by hand to a printed copy.

11.7 This Agreement is personal in nature, and neither party may directly or indirectly assign or transfer it by operation of law or otherwise without the prior written consent of the other party, which consent will not be unreasonably withheld. All obligations contained in this Agreement shall extend to and be binding upon the parties to this Agreement and their respective successors, assigns and designees.

11.8 Paragraph headings used in this Agreement are for reference only and shall not be used or relied upon in the interpretation of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date, written below.

|  | Company | Employee |
|---|---|---|
| Company | MTX Group Inc |  |
| Signature | *Saul Morse* | *[signature]* |
| By | Saul Morse | Richard Lynch |
| Address | 1450 Western Avenue, Suite 304<br>Albany, NY 12203 |  |
| Title | CEO | Account Executive |
| Date | 2/12/19 | 2/12/19 |



# EMPLOYMENT AGREEMENT
# ADDENDUM C - COMMISSION
# MTX GROUP INC.

**Employment Agreement Addendum C**



This addendum to the Employment Agreement, by and between MTX Group Inc, located at 1450 Western Avenue, Suite 304, City of Albany, State of New York ("**Company**"), and the Employee identified below (the "Employee").

Employee and the Company have executed an Employment Agreement (the "**Agreement**") to which this Addendum is made.

This Addendum shall be made a part of the Agreement. Only terms herein that differ from the Agreement shall replace those within the original Agreement. All other terms and conditions of the Agreement remain unchanged; and

This Addendum reflects the following change(s) and additions to the original Employment Agreement:

<u>**Commission**</u>

| Compensation Items | Maximum Possible Commission |
|---|---|
| **Commission**<br><br>**Non-RFPs**<br><br>For the duration of the Employee's first year, the Company shall pay a 5.5% percent commission on any sales made by the Employee on behalf of the Company.<br><br>Commission is paid in accordance with the MTX Commission Payment Policy.<br><br>After the first year, commission targets and percentages based on those targets shall change be.<br><br>**RFPs**<br><br>For any RFPs won and closed, you will receive compensation based on the following:<br><br>At most 3% of the contract value is allocated for commission payout based on the sourcing criteria below:<br>• Source and own only: 1.5%<br>• Source, own, and lead the response: 3%<br><br>Payment of RFP Commission will be in accordance with the MTX Commission Payment Policy. | Year 1 Quota: $2,000,000 booking<br><br>On Target Commission Earnings (Quota x Commission %): $110,000<br><br>Note: On Target Commission Earnings above are calculated based on Non-RFP deals. |

**Employment Agreement Addendum C**



| On-Target Earning (OTE) (base compensation + variable comp) | $180,000 |
|---|---|

Note, all commissions are based on MTX bookings. Any third-party fees, such as Salesforce license fees, included in a contract shall / pass-through expenses not be part of any commission calculation.

Acknowledged

|  | **Company** | **Employee** |
|---|---|---|
| Company | MTX Group Inc |  |
| **Signature** | *Saul Morse* | *Richard Lynch* |
| By | Saul Morse | Richard Lynch |
| Address | 1450 Western Avenue, Suite 304<br>Albany, NY 12203 |  |
| Title | CEO | Account Executive |
| Date |  | 12/12/19 |